**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      v.

GEORGE CONSTANTINE,             **1:21-CR-530 (SHS)- 5**
MARC ELEFANT,
ANDREW DOWD,
SADY RIBEIRO,
ADRIAN ALEXANDER

                Defendants.

**SENTENCING MEMORANDUM ON BEHALF OF ADRIAN ALEXANDER**

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

**Page**

INTRODUCTION ...................................................................................................1

I.     PERSONAL BACKGROUND............................................................................3

II.    RELATIONSHIPS WITH FAMILY AND FRIENDS........................................7

    **a.**    Adrian Is Well-Known As A Devoted Father, Husband, And Son-In-Law ...........8

    **b.**    Adrian Is Widely Known for His Generous Spirit, Both to Friends and Strangers .........................................................................................................9

    **c.**    Adrian is Quick to Come to The Aid Of Fellow Immigrants .................................9

    **d.**    Adrian Has Become a Medical Advocate for Friends, Family, and Strangers ....................................................................................................10

III.   OFFENSE CONDUCT....................................................................................13

    **a.**    Adrian Had No Influence over MRI Reports That Were Based on Scans from AMI .................................................................................................13

    **b.**    Adrian Was Unaware that Any of these Accidents Were Staged.........................15

    **c.**    Adrian Was Slow to Realize the Fraudulent Nature of the Cases ........................15

    **d.**    Adrian Pleaded Guilty to Continued Cooperation with Kerry Gordon and Bryan Duncan ...........................................................................................18

IV.   THE RELEVANT SENTENCING FACTORS INDICATE THAT A SUBSTANTAL TERM OF HOME CONFINEMENT WITH SUPERVISED RELEASE SHOULD MEET THE GOALS OF SENTENCING....................................19

    **a.**    Because of Adrian's Health and Age, Any Theoretical Benefit from Incarceration is Outweighed by the Expense and Consequences Associated with Incarceration. .................................................................................20

        i)    Adrian's Mental Health Issues Cannot Be Adequately Addressed If He Were to be Incarcerated....................................................................... 21

        ii)   Adrian's Physical Ailments Will Only Worsen with Age and Incarceration ...................................................................................... 23

    **b.**    Adrian Is Committed to Abiding by the Law, in Light of the Harm Inflicted on the Innocent Victims and His Family by His Misconduct...............................26

    **c.**    Adrian's Cooperation in This Case, Even Without the Benefit of a 5K1.1 Motion, was Substantial and Warrants a Sentence of Home Confinement ...........27

    **d.**    Adrian's Sentence Must Be Favorable in Comparison to Other Defendants, due to his Role in the Scheme and his Cooperation..............................................31

    **e.**    A Sentence of Extended Home Confinement Will Address the Sentencing Goals of Deterrence and Public Safety. ................................................................32

CONCLUSION.......................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007).....................................................................................................20

*Garcia v. United States*,
No. 04 CR 693(SJ), 2009 WL 3379135 (E.D.N.Y. Oct. 20, 2009) ........................26

*U.S. v. Coughlin*,
No. 06-2005, 2008 WL 313099 (W.D.Ark. Feb. 1, 2008).....................................29

*United States v. Barbato*,
No. 00 CR. 1028 (SWK), 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002) .............20

*United States v. Carmona-Rodriguez*,
No. 04 CR 667RWS, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)..........................20

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)....................................................................................19

*United States v. Demeo*,
No. 17-CR-545 (KAM), 2022 WL 142345 (E.D.N.Y. Jan. 15, 2022) ...................23

*United States v. Dorvee*,
616 F.3d 174 (2d Cir. 2010).....................................................................................19

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006).....................................................................................27

*United States v. Fernandez*,
443 F.3d 19 (2d Cir. 2006), *abrogated on other grounds by Rita v. United
States*, 551 U.S. 338 (2007) ....................................................................................26

*United States v. Gall*,
374 F. Supp. 2d 758 (S.D. Iowa 2005) ...................................................................20

*United States v. Gayle*,
No. 09-CR-358, 2010 WL 2540488 (E.D.N.Y. June 17, 2010) .............................29

*United States v. Jimenez*,
212 F. Supp. 2d 214 (S.D.N.Y. 2002)......................................................................20

*United States v. Jones*,
460 F.3d 191 (2d Cir. 2006).....................................................................................18

*United States v. Maurer*,
   76 F. Supp. 2d 353 (S.D.N.Y. 1999), *aff'd*, 226 F.3d 150 (2d Cir. 2000) ..............................26

*United States v. Moy*,
   No. 90 CR 760, 1995 WL 311441 (N.D. Ill. May 18, 1995)....................................................20

*United States v. Willis*,
   322 F. Supp. 2d 76 (D. Mass. 2004) ........................................................................................20

**Statutes**

18 U.S.C. § 3553...........................................................................................................................19

18 U.S.C. § 3553(a) .................................................................................................................19, 26

18 U.S.C. § 3553(a)(2)(D) ...........................................................................................................19

U.S.S.G. § 5H1.1 ..........................................................................................................................19

**Other Authorities**

B. Williams, et al., "Aging in Correctional Custody: Setting a Policy Agenda for
   Older Prisoner Health Care," 102 Am. J. of Pub. Health 8 (August 2012) ............................24

, https://www.cnn.com/2022/12/23/health/senior-wave-covid/index.html...................................23

Inspector General, Audit Division, "The Federal Bureau of Prison's Efforts to
   Manage Inmate Health Care" (Feb. 2008),
   https://oig.justice.gov/reports/BOP/a0808/final.pdf ................................................................23

Inspector General, "The Impact of an Aging Inmate Population on the Federal
   Bureau of Prisons" (2016), https://oig.justice.gov/reports/2015/e1505.pdf ...........................24

Jennifer M. Reingle Gonzalez and Nadine M. Connell, *Mental Health of
   Prisoners: Identifying Barriers to Mental Health Treatment and Medication
   Continuity*....................................................................................................................................21

K. Skarupski et al, "The Health of America's Aging Prison Population," 40 ...............................24

Marshall Project (November 21, 2018),
   https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-
   health-crisis-in-federal-prisons .................................................................................................22

Nov. 29, 2022, https://www.utsouthwestern.edu/newsroom/articles/year-
   2022/november-covid-19-vaccines-effectiveness.html .............................................................23

Thompson & Eldridge, "Treatment Denied: The Mental Health Crisis in Federal
   Prisons,"......................................................................................................................................22

U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (Mar. 2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview...................................................................................29

**INTRODUCTION**

We respectfully submit this sentencing memorandum on behalf of Adrian Alexander, who is currently scheduled to be sentenced on April 13, 2023, on conspiracy to commit wire fraud. Adrian has led an extraordinary and challenging life, beginning with turmoil in Romania before he immigrated to the United States with his parents in 1964. Because of his determination and exceptional hard work, he experienced early academic success, despite the many obstacles that life threw at him, such as his father's untimely death, poverty and depression. Thereafter, Adrian embarked on a career of remarkable corporate jobs and a long series of entrepreneurial efforts, diving deep into financial analysis and spreadsheets, and strategizing on how to steer various businesses.

Nowadays, Adrian has had nothing but time to contemplate his past since the indictment against him was unsealed, and he was arrested on October 19, 2021. To Adrian, litigation funding started out as another business venture. But now, he deeply regrets what he did, and that he did not ask more questions, allowing his business ambitions to cause harm to vulnerable people. Moreover, his actions have impacted his family in an irreversible way. Adrian was arrested while traveling home to celebrate his daughter's eighteenth birthday. Adrian's daughter Allegra was devastated by his arrest, and she has been in psychotherapy ever since. Additionally, when Adrian's mother-in-law, with whom Adrian was very close, passed away last year, he was unable to travel to Italy to pay his respects or support his wife and family as they grieved without him.

Adrian's involvement in this scheme is rather simple, but his involvement in the government's investigation(s) of the scheme is more complicated. Indeed, long before the unsealing of this indictment in October 2021, Adrian had been in contact with federal prosecutors about his involvement in this matter. At every turn, he communicated his willingness to cooperate

in the investigation. In fact, Adrian communicated his willingness to cooperate with law enforcement as far back as the summer of 2017, when he received and responded to grand jury subpoenas from the U.S. Attorney's Offices for the Eastern and Southern Districts of New York (the "EDNY" and "SDNY," respectively). Adrian advised prosecutors in both offices that he was willing to cooperate in their investigations. In September 2017, the EDNY informed Adrian that his interviews with EDNY may be attended by interested SDNY prosecutors. Adrian welcomed their attendance and participation. In July 2018, an IRS Criminal Investigation agent investigating Adrian's now-codefendant, Andrew Dowd, interviewed Adrian in the EDNY investigation. And when the SDNY subpoenaed Adrian in April 2019 to authenticate the thousands of records he previously provided to them for the Kalkanis trial, he again communicated his willingness to cooperate with them.

After his arrest in October 2021, Adrian quickly reiterated his willingness to step forward and tell the government everything about his involvement in the scheme, as well as the roles of others. SDNY prosecutors accepted Adrian's offer to cooperate in this case. He met with SDNY prosecutors on five separate occasions from April to August 2022, answering questions for several hours at a time. Outside of these sessions, Adrian continued to contemplate how he could be helpful to the government. He spent his time thinking deeply about his past actions, and volunteered any information he thought could be potentially useful. But on August 25, 2022, he was informed that he would not be offered a cooperation agreement. Within a week, he pleaded guilty to the current charge, neither burdening the Court nor the Government with discovery demands, motions or any other material effort to contest the charge against him. In total, Adrian tried to cooperate and take responsibility for his actions in this case for almost six years. We respectfully submit that this represents highly unusual and extraordinary efforts at cooperation.

As he approaches seventy-seven years of age, Adrian is entering the home stretch of his life. He suffers from various ailments, including severe anxiety and bipolar disorder. To maintain his delicate mental health, Adrian has seen his psychiatrist Dr. Stephan Quentzel frequently for the past fifteen years. Furthermore, in recent years, Adrian underwent back surgery and an angioplasty which revealed that one artery was experiencing at least sixty percent blockage. On March 28, 2023, Adrian learned that he would need to undergo back surgery again. Incarceration is unquestionably a threat to his life. Given his psychiatric and medical treatment regimes, the Bureau of Prisons' (the "BOP") inability to appropriately manage said conditions and treatment, and his extraordinary efforts to cooperate and accept responsibility in this case, we respectfully request that the Court sentence Adrian to an substantial period of home confinement. Such a sentence will sufficiently reflect the seriousness of the crime committed, but similarly serves the humane purpose of allowing him to maintain his extremely fragile mental health, and potentially spare his life.

## I.   PERSONAL BACKGROUND

Adrian Alexander was born in Bucharest, Romania, ███████████. His father owned a small manufacturing company; his mother first met his father while working as his assistant. He was an only child who grew up in a peaceful household. Throughout his childhood, Adrian devoted time to both his studies and sports. He was a member of the junior national water polo team, and excelled in his academic studies. Nonetheless, the peace in Adrian's family life was fragile. As a Jewish family in Romania, then dominated by the Soviet Union, Adrian's family was the target of various government actions. His father's manufacturing company was confiscated by Romania's Communist government. Adding to the pressure on Adrian's family, a member of the

Communist government made it abundantly clear that he wanted to take possession of the family's apartment.

Adrian's parents repeatedly applied to immigrate to the United States, citing their risk of persecution as a Jewish family. They made numerous attempts to escape; in one instance, they were caught and imprisoned.[1] The family was finally granted permission to immigrate in 1964, shortly after Adrian had graduated from Floreasca High School in Bucharest and was admitted to the Bucarest Polytechnic Institute, a highly selective Romanian university. In exchange for the American dream, Adrian gave up his hard-earned seat at the Bucarest Polytechnic Institute where he had planned to study engineering.

Adrian and his family arrived in New York City in May 1965 and settled in New Jersey. Immigrating to the United States was a difficult beginning for Adrian's family. Adrian's father took a job working as a parking attendant in Newark Airport. Adrian himself got a job on Seventh Avenue, where he would transport carts of fabric from cloth manufacturers to apparel manufacturers. Subsequently, he landed a job in the mailroom of Public Service Mutual Insurance Company.

Despite being in a new country, Adrian did not abandon his dreams of a college education. He desperately sought admission at various universities throughout New York City. With his Romanian high school diploma and no financial resources, he was a gamble for any university. Nevertheless, New York University ("NYU") took a chance on him—the dean promised that if Adrian paid for his first semester at NYU and attained high grades, NYU would give him a scholarship to cover the rest of his college education. Adrian used all of his prior earnings from his jobs transporting mail and sorting mail to pay for the first semester at NYU.

---

[1] Exhibit 1, Letter of Susi Belli, Adrian's wife.

In the fall of 1965, Adrian began his first semester at NYU, while tutoring students in math and physics for much needed income. Adrian had a successful first semester at NYU and was granted the scholarship promised to him by the dean. But just as things were starting to stabilize and move in the right direction for Adrian, his life in the United States took an abrupt turn for the worse. Adrian's father passed away from a massive heart attack in December 1965, only seven months after arriving in the United States and shortly after Adrian completed his first semester at NYU. The death of his father triggered a deep depression in Adrian that would resurface throughout his life.

Regardless, Adrian had responsibilities that required him to maintain a high level of functioning, with or without depression. Adrian's mother barely spoke English and was essentially unemployable. Accordingly, the burden fell on Adrian to provide for himself and his mother. To support himself and his mother, Adrian ramped up his hours continuing to tutor his fellow NYU students in mathematics and physics, while still maintaining the full course load necessary to graduate with a Bachelor of Science in Electrical Engineering.

Despite the pressures on his time, his mental health issues and his responsibility to support his mother, Adrian continued to be a good student. He graduated from NYU with a Bachelors in Electrical Engineering in 1969. Upon graduation, he was hired by Bell Labs, who paid him a full salary to work three days a week. Bell Labs also paid Adrian's tuition at NYU, so he could attend NYU two days a week to pursue a Master's Degree in Electrical Engineering.

Adrian's academic success continued when he was admitted to Harvard Business School. He was awarded a Pell Grant to pay for his tuition at Harvard Business School. Adrian juggled both his coursework at NYU and Harvard, graduating with a Master's degree in Electrical

Engineering from NYU in 1971 and an MBA from Harvard in 1972. After he graduated from Harvard, Morgan Stanley hired Adrian as a corporate finance associate.

In 1975, Adrian was hired by Kuhn Loeb as a vice president of mergers and acquisition. In 1978, Adrian lost his job at Kuhn Loeb, due to a SEC investigation into insider trading allegations. In 1980, Adrian pleaded guilty to insider trading, for which he received a suspended sentence and a $5,000 fine.

To understand Adrian's poor decision-making, one must consider his origins in Romania, where he learned to pursue his ambitions, but with the constant fear that merit alone would never be enough. That fear drove him to inflict misfortune on himself. Nevertheless, still driven by ambition, desperation, and fear, Adrian struggled with how to be gainfully employed despite a felony conviction on his record. Indeed, he could no longer return to the institutions of Wall Street to utilize his skills and many years of experience in the financial markets. As a result, in 1978, Adrian moved to Milan, Italy, to work at an executive recruiting firm. He did not return to the United States until 1983.

His return to the United States marked the beginning of a hardscrabble entrepreneurial career, where he crisscrossed the country for gainful employment and entrepreneurial opportunities. In 1983, Adrian went to Minneapolis, Minnesota. A friend had told him about Sport About, a company that needed a guiding hand to bring it back from the brink of bankruptcy. After three years as CEO of Sport About, Adrian improved Sport About's operations to the point where he could justify unraveling the franchise agreements and allowing the franchises to operate independently. In 1987, he returned to New York to work for a British company, Polly Peck International, where he helped to coordinate various investments, including the acquisition of Del

Monte's fruit division.  In 1991, Adrian moved to Denver, Colorado, to assist another company, Corporate Express, with consolidating the corporate stationary business.

Adrian returned to New York City in 1997 and started a small real estate investment fund. The fund was modestly successful; Adrian sold the fund for a profit in 1999 and returned the money to investors.  To this day, Richard Ortoli, Adrian's business partner in the investment fund, has effusive praise for Adrian as a business partner, specifically for his ethical character and business acumen.[2][3]  From 1999 to 2008, Adrian worked on  a few ventures, applying his business skills to start-ups in various industries, such as ridesharing and health care.  In 2006, Adrian heard about an opportunity to buy Astoria Medical Imaging ("AMI") and decided to acquire the business.

Soon after acquiring AMI, Adrian realized that he was in way over his head.  He had no prior experience in radiology or the administration of a medical practice, much less a failing one like AMI.  His wife Susi Belli recalled the decision to buy AMI as an "impulsive" decision, probably born out of a manic episode when Adrian's bipolar disorder was not yet under control. Nevertheless, Adrian persevered and hired Jaime Fradelakis, a person with experience in health care, to serve as AMI's manager.  Jaime ran the day-to-day business of AMI, while Adrian managed the financials and direction of the company remotely, alongside his other ventures.  Even though he was managing several jobs at once, Adrian, along with Jaime, managed AMI well enough to sell AMI in 2016 for a modest profit.

## II.   RELATIONSHIPS WITH FAMILY AND FRIENDS

Due to his upbringing and difficult start in the United States, Adrian is quick to empathize with others.   His relationships with family and friends reflect how much he values these

---

[2] Exhibit 2, Letter of Richard Ortoli.
[3] Exhibit 3, Letter of David R. Topping (calling Adrian "bright, enthusiastic and experienced," as well as "honest to a fault and completely transparent.")

interpersonal relationships.  He has helped a number of friends for extended periods of time in difficult health situations, acting as a patient advocate and a shoulder to lean on, as seen in the attached Letters of Support.  There is little doubt that his family and friends benefit from his generosity and eagerness to help those in need.

### a.   Adrian Is Well-Known As A Devoted Father, Husband, And Son-In-Law

Adrian met his wife Susi in 1993 at a dinner party.  They were married on July 25, 1996, in New York City.  He and his wife have two children: a son, Gregory, who is twenty-three years old and a soon-to-be graduate of NYU; and a daughter, Allegra, who is nineteen years old and a student at Northeastern University.  Due to his own past, Adrian is acutely aware of the fragility of a happy family life.  Thus, Adrian's priority has always been his family.  He relies on his family to ground him and provide him with strength.  In return, he has gone above and beyond not only for his own wife and children, but also for his in-laws.

Adrian is widely known for his devotion to his children.[4] [5] [6] [7] [8]  Adrian and Susi raised their children in a loving home that valued decency, loyalty and the pursuit of learning.[9]  Notably, Gregory was diagnosed with ADHD as a child. [10]  Adrian spent countless hours guiding his son.[11]

---

[4] Exhibit 4, Letter of Theodore J. Erikson ("He has always been a highly devoted and involved father…Both [Gregory and Allegra] are terrific kids who acquired their kindness, integrity and intellectual challenge not by parental edict, but from the example of their parents.").

[5] Exhibit 5, Letter of Brian V. Murray ("I have known Adrian as a dedicated family man.").

[6] This devotion to being a model parent extends beyond his own children.  *See* Exhibit 8, Letter of Wendy Popowich.

[7] Exhibit 6, Letter of Salvatore J. Zizza ("Adrian and I have often discussed the joy of parenting, as well as our concerns on how to best raise our children.")

[8] Exhibit 7, Letter of Jaime Fradelakis ("Adrian has been supportive to me, offering parental advice ██████████████████████████████████████████████.")

[9] Exhibit 4, Letter of Theodore J. Erikson.

[10] Exhibit 9, Letter of Gregory Alexander.

[11] Exhibit 9, Letter of Gregory Alexander.

His efforts paid off: Gregory matriculated at NYU and will be graduating from NYU this semester with a math and economics degree after a rewarding academic career.[12]

### b. Adrian Is Widely Known for His Generous Spirit, Both to Friends and Strangers

As the Court is aware from numerous letters of support, Adrian's friends describe him as someone who is "always…available to listen and help,"[13] and "can always be counted on to do whatever it takes to help a friend in need," [14] "whether due to financial problems, illness or family issues."[15] He "puts the health and future of his friends a priority first." [16] He is "supportive," and "always lends a helping hand to all in need."[17] [18]

### c. Adrian is Quick to Come to The Aid Of Fellow Immigrants

Remembering his own childhood and immigration to the United States, Adrian consistently extends a helping hand to individuals who find themselves abroad in difficult circumstances. Adrian met Mihail Negoescu through a mutual friend in Romania. Adrian knew how difficult life in Romania could be, and how harrowing immigration to the United States was. In 1969, four years after leaving Romania himself, Adrian helped Mihail to escape from Romania. He personally drove from Yugoslavia to Italy, finally completing Mihail's departure from Romania. Adrian then sponsored Mihail to come to the United States and guided Mihail to apply for and earn an MBA from NYU.[19]

---

[12] Exhibit 9, Letter of Gregory Alexander.
[13] Exhibit 11, Letter of Michael Negoescu.
[14] Exhibit 2, Letter of Richard Ortoli.
[15] Exhibit 5, Letter of Brian V. Murray.
[16] Exhibit 12, Letter of Graziela Haim.
[17] Exhibit 7, Letter of Jaime Fradelakis.
[18] *See also* Exhibit 8, Letter of Wendy Popowich ("[Adrian has been] a supportive friend to me when I was experiencing personal hardship during my divorce, breast cancer, and a near-death car accident.").
[19] Exhibit 11, Letter of Michael Negoescu.

When Maria Teresa Cometto, a journalist from Italy, and her husband Glauco Maggi moved to New York City in August 2000, she and her husband met Adrian briefly at a dinner party.  But after the September 11 attacks, Maria and her husband could no longer live in their Battery Park apartment.  On short notice, Adrian welcomed Maria and Glauco — two strangers he had met in passing at a dinner party — into his home, and provided them with  food and a space to work.  The couple stayed in Adrian's apartment for almost three months, where the journalists provided on-the-ground coverage of the September 11 attacks for the Italian news media.  Maria and Glauco have remained in New York City since 2000.  New York City is now their home, and they remain grateful to Adrian for aiding them during the rocky start to their time in their new home.[20]

### d.  Adrian Has Become a Medical Advocate for Friends, Family, and Strangers

Adrian's "real self" is revealed in his medical advocacy.[21]  In or around July 10, 2021, Adrian's mother-in-law fell and broke her pelvis while Adrian and his daughter  were visiting her in Italy.  She was already suffering from dementia when she fell.  Adrian's mother-in-law contracted sepsis; she began to suffer from a fever and to slip in and out of consciousness.  The second hospital's staff advised Adrian that at her age, there was nothing that they could do to save her.  But Adrian always listened to his mother-in-law's insistence that she wanted to live.  Over the course of several months, in Adrian's quest to save her life, Adrian helped his mother-in-law transfer among a total of five different hospitals.  Finally, on October 21, 2022, she was sent home with round-the-clock care.

---

[20] Exhibit 13, Letter of Maria Teresa Cometto.
[21] Exhibit 14, Letter of Antonella Nava.

Adrian also rose to the occasion when his wife was diagnosed with ovarian cancer in 2012. Susi underwent a rigorous eight-month treatment schedule, including surgeries and treatments.[22] [23] Adrian was at his wife's side the entire time, not only as a physical and emotional support, but as her patient advocate. He spent hours teaching himself about ovarian cancer, the possible course of the disease, and the limited treatment options.

Adrian's advocacy extends beyond his family. In numerous instances, he has helped friends confront the most complex medical issues. These diagnoses were often devastating— Adrian's friends often heard grim prognoses for their life expectancy, quality of life, or both. In times of illness, an ordinary friend may provide a meal or sympathetic ear. Adrian insists on doing more, by providing his friends a helping hand with critical healthcare decisions. Not only has he assisted US residents with navigating the US healthcare system, but he went even further to assist friends in Europe with navigating their healthcare options in Europe. In situations where people often feel lost, overwhelmed and misguided by medical professionals, Adrian has become a voice for these patients who, if they were not already, became his lifelong friends.

Adrian's efforts ensured that his friends felt like no matter what the outcome was, all possible options had been explored. For example, in 1999, Adrian helped Antonella Nava when her first child was diagnosed with Type 1 Werdnig-Hoffman disease, a rare, congenital and fatal disease that causes the muscles to atrophy. Adrian consulted with experts in the United States and transmitted his research to the children's hospital in Milan, Italy, where Antonella's first child was being treated. Antonella and her husband appreciated Adrian's research; it was a comfort to have the condition clarified as they prepared for their child's death. Antonella's second child was diagnosed with a congenital heart defect. Adrian again consulted numerous experts so that

---

[22] Exhibit 1, Letter of Susi G. Belli.
[23] Exhibit 8, Letter of Wendy Popowich.

Antonella understood what her child was experiencing. Partly because of Adrian's persistent efforts to find a solution, Antonella's second child eventually underwent surgery at Boston Children's Hospital. Throughout her various check-ups and after the actual procedure, Antonella and her daughter stayed with Adrian for two to three weeks at a time.[24]

When Peter Marshall, Adrian's classmate from Harvard, was diagnosed with mast cell activation syndrome, Adrian took it upon himself to be Peter's support. Mast cell activation syndrome is a chronic disease with devastating effects on quality of life. Even while Peter's physical and mental health deteriorated, Adrian refused to give up. Adrian searched throughout the world for specialists who could help Peter. And maybe even more importantly, Adrian spent hours every day providing much needed emotional support to his friend.[25]

Adrian's compassion and efforts extend even to those with whom he is not particularly close. Graciela Haim and Adrian were not friends prior to 2003, but unfortunately, in 2003, Graciela's husband Eduardo was diagnosed with glioblastoma, a deadly and aggressive brain cancer. Adrian learned of the diagnosis through a mutual friend and went to New York-Presbyterian to offer his assistance. He helped Graciela and Eduardo come up with a treatment plan. Adrian's efforts never wavered for the five years after Eduardo's diagnosis. He constantly researched possible therapies on his own time, and helped Graciela and Eduardo on a regular basis to revise Eduardo's treatment plan and consider new possible treatments. Graciela remains grateful that her husband managed to live an additional five years, when he was initially predicted to live less than a year.[26] [27] Being all too familiar with feelings of fear and despair, Adrian refused to give up on his friends.

---

[24] Exhibit 14, Letter of Antonella Nava.
[25] Exhibit 2, Letter of Richard Ortoli.
[26] Exhibit 12, Letter of Graciela Haim.
[27] Exhibit 2, Letter of Richard Ortoli.

It is worth noting that these letters represent only a fraction of the deep affection that Adrian's family and friends feel toward him. Adrian's friendships often last many decades, reflecting his giving spirit, charisma and interest in the welfare of others. It is a testament to his character that his friends have stayed close and loyal to him all these years later.

## III. OFFENSE CONDUCT

To be clear, Adrian has fully accepted responsibility for his criminal conduct and is extremely remorseful for the harm that was visited upon others because of his involvement in this scheme. In addition to entering into the plea agreement with the government in which he admitted to the offense conduct, Adrian provided the Court with a detailed allocution during his plea hearing that precisely described his role in the conspiracy. Adrian recounted that "for my part, I knowingly provided nonrecourse loans to plaintiffs that were used to fund numerous unnecessary medical procedures."[28] Having acknowledged that he provided such loans to plaintiffs for unnecessary medical procedures, Mr. Alexander continues to respectfully object to the Presentence Investigation Report's ("PSR") description of his conduct, which overstates Adrian's conduct in several important regards.

### a. Adrian Had No Influence over MRI Reports That Were Based on Scans from AMI

First, the PSR overstates the role that Astoria Medical Imaging ("AMI") played in this scheme. PSR ¶¶ 17-24. Adrian acknowledges that some MRIs used in the scheme were performed at AMI. He also has admitted that he once encouraged Kalkanis to bring patients to AMI. But that was the extent of it. Adrian never entered into an agreement with Kalkanis to provide positive MRIs. Indeed, the investigation revealed that if Kerry Gordon and Bryan Duncan received negative MRI readings at AMI, they understood that per Peter Kalkanis's instructions, they were

---

[28] *See* Adrian Alexander Plea Tr. ("Plea Tr.") 22:23-23:5.

to go to All County Medical Imaging Center.  If the All County MRI turned out to be negative as well, another reading would be done at All County, to ensure that it was positive.[29]  There was no such guarantee at AMI.

Furthermore, Adrian never interfered with the results of an MRI.  Even had he wanted to, Adrian simply could not have—it would have been physically impossible for Adrian to alter MRIs or the readings thereof.  After the MRI scans were performed at AMI, the images from the MRI scan were never in AMI's possession or control.  Instead, the images were transmitted electronically via a picture archiving and communications system ("PACS") to a location in Middle Village (six miles away from AMI) to the radiologist, who had the expertise and training to interpret the images.  There is no evidence that AMI's radiologist was corrupted in any way.  And it further defies logic to infer that the radiologist could have known which MRIs, of the thousands conducted at AMI each year, pertained to Kalkanis-related patients.  In fact, less than one percent of the MRIs performed at AMI from 2010 to 2014 were related to Kalkanis.  This is not to say, of course, that Adrian is any less guilty of the offense to which he pleaded guilty, but to clarify for the Court a misunderstanding of the extent to which AMI or its employees were involved in Adrian's criminal conduct.

Additionally, there is no indication that AMI's MRIs, en masse, were inadequate.  During the trial of George Constantine and Andrew Dowd, Dr. Neil Roth provided expert testimony in which he discussed his review of eighty-three patient files.[30]  Dr. Roth stated that he did not know the government's criteria for selecting these particular patients.[31]  At trial, the jury only viewed three MRI reports, one of which was from AMI.[32]  Again, Dr. Roth only reviewed eighty-three

---

[29] Exhibit A, FBI 302 for Kerry Gordon Jun. 5, 2019 Proffer, at 8.
[30] Constantine & Dowd Trial Tr. ("Trial Tr.") 1108:12.
[31] Trial Tr. 1108:21-25.
[32] Trial Tr. 1111:12 – 1112:25.

patient files – a small fraction of the patient files handled by AMI and All County over the years that they were in operation. At best, Dr. Roth's testimony concluded that a limited number of the MRI reports were insufficiently descriptive and positive. And Dr. Roth's testimony did not conclude that this subset of MRI readings was flawed because of anyone's inappropriate influence on the radiologist. Again, this evidence does not make Adrian any less guilty of the crime to which he pleaded guilty. But we think that it is an essential clarification for the Court's understanding of the specific criminal conduct to be considered.

### b. Adrian Was Unaware that Any of these Accidents Were Staged

There is no evidence that Adrian knew that some portion of the underlying accidents were staged. PSR ¶ 31. Adrian never met a patient/plaintiff during the screening process. He would have had no way of knowing whether an accident was real or staged, and there is no evidence suggesting that his co-conspirators informed him that the accidents were staged. Frankly, the co-conspirators had no incentive to share such unfavorable details with a person from whom they hoped to borrow tens of thousands of dollars for litigation funding. Indeed, these details about an accident were logically better left unsaid when requesting a loan predicated on assessing the likelihood of repayment with substantial interest. Again, Adrian is clearly guilty of becoming aware that that he was funding unnecessary surgeries, and deciding to continue with that illicit practice regardless. Certainly, Adrian's lack of knowledge of all of the circumstances surrounding the fraudulent claims makes him no less guilty of the crime to which he has pleaded. That said, we respectfully submit that a fair understanding of Adrian's knowledge of the actions of his co-conspirators should assist the Court in fashioning a just sentence for him.

### c. Adrian Was Slow to Realize the Fraudulent Nature of the Cases

Adrian is currently clear-eyed about his role in this criminal conspiracy. At some point, given the sheer volume of cases, he became aware that he was funding lawsuits that involved

unnecessary surgeries. That was criminal conduct for which he is deeply ashamed and remorseful. He has no illusion that a reasonable person could have been blind to these cases being less than legitimate. Nevertheless, Adrian's involvement in the scheme was more of an evolution in understanding: like many fraudsters, he did not start out with the intent to fund fraudulent lawsuits. By the end of 2014, however, he began to notice an increase in the volume of cases. At first, Adrian attributed the high volume to an efficient business model. But he later realized that what he was doing was wrong, although he continued his involvement to avoid terrible financial consequences. For the record, he was but one of several funders, including Case Cash, Chrome Legal Funding LLC, Fast Trak Legal Funding, Five Star Funding, Sunset Properties, and Weingarten Financial Funding, lending money in the exact same space.[33] [34] These other funders loaned money the same way that Adrian did, and the terms of their funding agreements were essentially the same.[35] [36]

But Adrian's concerns about the legitimacy of the cases grew as he talked to his co-conspirators, who told him that Kalkanis was pushing borderline (*i.e.*, unnecessary) surgeries to increase the value of settlements. Adrian began to realize that the sheer volume of cases was "too good to be true." It is undisputed that in November 2014, when Adrian learned that Kalkanis failed to pay income taxes and had been forging patient signatures (a critical element of the loan agreement process),[37] Adrian decided to terminate his business relationship with Kalkanis. He had come to understand that he had been involved in a litigation mill, that pushed plaintiffs to

---

[33] Trial Tr. 2003:3 – 2003:5.
[34] Exhibit B, Notes from May 14, 2019 Proffer for Kerry Gordon ("May 14, 2019 Gordon Proffer").
[35] Trial Tr. 430:9 - 433:23.
[36] Exhibit B, May 14, 2019 Gordon Proffer.
[37] Trial Tr. at 458:18-459:10.

surgeries with the same lawyers and doctors for the sole purpose of increasing the cases' settlement value.

Adrian was not the only funder to realize that he was dealing with fraudulent cases. Jason Krantz, a manager at Fast Trak funding, was apparently willing to fund any sort of case, even though Bryan Duncan and Kerry Gordon had informed Krantz that Peter Kalkanis was forging the patient contracts, a practice that Adrian rejected.[38] According to the investigation, Krantz's reaction to news of the forged contracts was to ask how they knew that the cases were forged.[39] Even after Duncan and Gordon told Krantz that they had observed the forgery, Krantz continued to buy cases.[40] He ended up taking hundreds of cases from Duncan and Gordon.[41] [42]

Another example would be Michael Kimmel, the owner of Sunset Management Funding, who was characterized by the government "as a funder [who was] involved in the scheme" and operated in a manner similar to Adrian.[43] Kimmel received all of the same information that Adrian received: "the emergency room reports, the MRIs that were developed, and any other doctors' notes or therapies that were performed on each individual patient."[44] Sunset Management Funding made money in this scheme in the same manner that Adrian did, via high interest loans.[45] The involvement of other funders does not make Adrian – or frankly them – any less guilty of participating in a fraudulent scheme. But it does explain why Adrian did not immediately realize

---

[38] Exhibit C, FBI 302 for Jun. 17, 2019 Gordon Proffer ("Jun. 17, 2019 Gordon Proffer"), at 3.
[39] Exhibit C, Jun. 17, 2019 Gordon Proffer, at 3.
[40] Exhibit C, Jun. 17, 2019 Gordon Proffer, at 3.
[41] Exhibit B, May 14, 2019 Gordon Proffer.
[42] Exhibit D, FBI 302 for July 1, 2019 Gordon Proffer, at 8-9.
[43] Trial Tr. 2315:24 – 2316:2.
[44] Trial Tr. 1658:5 – 11.
[45] Trial Tr. 1659:5 – 13.

how wrong it was to fund so many cases that involved the same surgeries conducted by the same doctors and the same lawyer representing the numerous plaintiffs.

### d. Adrian Pleaded Guilty to Continued Cooperation with Kerry Gordon and Bryan Duncan

When Adrian realized the fraudulent nature of Kalkanis's scheme, he was stymied by the amount of money that he had borrowed from his investors to fund these lawsuits. As Adrian has repeatedly admitted, it is from that point that the bad decisions, which serve as the basis of his guilty plea, continued. Undoubtedly, knowing what he knew at the end of 2014, Adrian should have walked away from the entire scheme and have broken the news to his investors that he had mishandled their money. But unfortunately, he chose the easier path and doubled-down on the scheme to maintain the income stream and preserve investor money. Without question, Adrian felt like he was in a tight spot—if he stopped his litigation-funding business immediately, he would have been in a crippling amount of debt to the high-net-worth individuals from whom he had borrowed. Moreover, there were personal and social concerns weighing on this decision: these high-net worth individuals were not only investors, but long-time friends and business partners. This regrettably put additional pressure on Adrian not to renege on his promises. He concluded, wrongly, that the only way he could extricate himself from this predicament was to make enough money in the short term to pay off his lenders. Then, he could avoid being involved with any more business with individuals in Kalkanis's circle.

At the heart of Adrian's guilty plea was his agreement, given what he had learned from his dealings with Kalkanis, to continue to deal in the Duncan and Gordon scheme. To the extent there is evidence that Duncan and Gordon fabricated or staged accidents, Adrian had no knowledge of that. But he certainly did understand that by taking up with Kalkanis's former proteges, who were working with the same doctors and lawyers, he was presumably engaging in the same practice of

pushing unnecessary medical procedures to personal injury plaintiffs. Adrian also understood that the patients were from the lowest socioeconomic circumstances.[46] Though hardly an excuse, Adrian's fear of financial ruin caused him to focus on his own vulnerability, rather than on the harm he was causing to the real people who were undergoing surgeries funded by his company. As Adrian stated in his plea allocution, he was "business-oriented" and did not "pay enough attention to what's happening" behind the spreadsheets and cash flows.[47] "But that's not an excuse, it's just a fact."[48]

The Court should be assured that Adrian now knows better.

## IV. THE RELEVANT SENTENCING FACTORS INDICATE THAT A SUBSTANTAL TERM OF HOME CONFINEMENT WITH SUPERVISED RELEASE SHOULD MEET THE GOALS OF SENTENCING

Adrian's plea agreement reflects a stipulated maximum Guidelines sentence of 60 months. As the Court is aware, the Sentencing Guidelines are advisory. *United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) ("[T]he Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves.") Indeed, the Court must use its own factfinding abilities to consider a wide variety of factors beyond what the Sentencing Guidelines consider. The Sentencing Guidelines require that the imposed sentence be "sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553. The Sentence Guidelines cannot be presumed to be reasonable. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). What makes a sentence reasonable is an "individualized application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 45-46 (2007)).

---

[46] Trial Tr. 474:14-22.
[47] Plea Tr. 24:1-4.
[48] Plea Tr. 24:1-4.

The Probation Office has identified "Adrian's physical/mental health ailments…positive adjustment to pretrial service, and the need to avoid unwanted sentencing disparities as factors that may warrant a non-guideline sentence, pursuant to the factors found in 18 U.S.C. § 3553(a)."[49] For the same reasons cited by the Probation Office, we respectfully submit that an appropriate period of home confinement would best serve the objectives of the Sentencing Guidelines.

### a. Because of Adrian's Health and Age, Any Theoretical Benefit from Incarceration is Outweighed by the Expense and Consequences Associated with Incarceration.

The Sentencing Guidelines states that a sentence must reflect "the history and characteristics of the defendant," 18 U.S.C. § 3553, including the health and age of the defendant. As the Court knows, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1. Furthermore, the sentence must also consider that the defendant may need "medical care," to be provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Thus, the question is not whether the BOP can provide necessary and appropriate care. Instead, the question is whether "an extremely infirm defendant is so incapacitated that the ordinary purposes of incapacitation and deterrence of recidivism do not justify the expense of extended incarceration." *United States v. Jimenez*, 212 F. Supp. 2d 214, 217 (S.D.N.Y. 2002). "A sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S at 54 (quoting *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005)).

---

[49] PSR ¶ 119.

Adrian is almost seventy-seven years old.  He suffers from severe bipolar and anxiety, among other complex mental and physical health issues.[50] [51] [52] [53]  He has long-standing relationships with several doctors to address his long-term health problems.  As he ages, these problems will only become more burdensome.  A term of incarceration would be difficult on his health, as well as on the BOP, who would be simply incapable of maintaining his current mental health treatment.[54]

### i)  Adrian's Mental Health Issues Cannot Be Adequately Addressed If He Were to be Incarcerated

Adrian's mental health is not conducive to a term of incarceration.  Adrian has dealt with emotional highs and lows throughout his entire life.  His first time experiencing severe depression was when his father passed away in 1965.  In the decades since, Adrian's mood swung up and down, from depression to mania and back.  He often make rash decisions, including financial decisions, in his bouts of mania where he felt "invincible."  His bipolar disorder put his family into "constant turmoil," as they navigated both the financial and psychological consequences of the "rollercoaster" that was Adrian's moods.  His family

---

[50] Exhibit 15, Letter of Dr. Stephen Quentzel.

[51] Exhibit 17, Letter of Dr. Patrick O'Leary.

[52] Exhibit 18, Nov. 2022 Back Surgery Records.

[53] Exhibit 19, Prostate Surgery Report.

[54] *United States v. Carmona-Rodriguez*, No. 04 CR 667RWS, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (downward departure warranted due to defendant's physical health concerns, anxiety, and depression); *United States v. Barbato*, No. 00 CR. 1028 (SWK), 2002 WL 31556376, at *4 (S.D.N.Y. Nov. 15, 2002) (eighty-one-year old defendant sentenced to home confinement because he required continuous monitoring for his spinal stenosis and coronary artery disease, among other diseases); *United States v. Willis*, 322 F. Supp. 2d 76, 85 (D. Mass. 2004) (defendant sentenced to probation because defendant was sixty-nine years old and suffering from a variety of health problems, burdening BOP with substantial costs); *United States v. Moy*, No. 90 CR 760, 1995 WL 311441, at *29 (N.D. Ill. May 18, 1995) (downward departure warranted when seventy-year-old defendant previously underwent coronary angioplasty and required continued supportive psychotherapy.).

alternated between restraining Adrian from an impulsive decision and trying to rescue him from his suicidal thoughts.[55] [56]  Throughout the years, Adrian saw various psychiatrists, but they did not provide any relief.

Adrian and his family only made it off the rollercoaster in 2007, when Adrian began seeing Dr. Stephan Quentzel, a psychiatrist.  Dr. Quentzel diagnosed Adrian with a lifelong case of severe bipolar disorder and anxiety.   Under Dr. Quentzel's supervision, Adrian tried a variety of medication to stabilize his mood, including Atarax, Abilify, Ambien, Campral, Cymbalta, Gabapentin, Latuda,  Rozerem, Trileptal, and Wellbutrin.  Recently, Dr. Quentzel has prescribed a combination of Inderal, Klonopin, Lavaza, Lamictal, lithium, Seroquel, Synthroid, Trazodone, and Xanax.  Since he began seeing Dr. Quentzel, Adrian has visited Dr. Quentzel every one to three months.  At these appointments, Dr. Quentzel works with Adrian to minimize his bouts of depression and mania, through continual fine tuning of Adrian's regiment of medication.  Since his arrest in October 2021, Adrian has continued to visit Dr. Quentzel, who has been constantly adjusting Adrian's medications to counter Adrian's rising anxiety and depression. [57]

Incarceration would significantly worsen Adrian's mental health.  The stress and anxiety inherent to incarceration would disproportionately impact Adrian's mental health.  And the BOP is most likely not equipped to handle Adrian's constantly-shifting medication requirements.  The drop-off in mental healthcare after intake by the BOP is stark, with "fewer than 50% of those who reported taking medication for a mental health condition at intake report[ing] not receiving

---

[55] Exhibit 1, Letter of Susi Belli.
[56] *See* Exhibit 8, Letter of Wendy Popowich ("I was an intimate observer of the manic episode Adrian experienced as he advocated for his beloved wife during [her 2012-2013 treatment for ovarian cancer] which was followed by an extensive period of severe depression.").
[57] Exhibit 15, Letter of Dr. Stephan J. Quentzel.

medication for this condition in prison."[58]  The BOP is even more likely to deprioritize Adrian's condition, since he suffers from a less identifiable mental disorder that usually does not present as a security risk.[59]  The lack of access to a psychiatrist who can keep him stable and functioning will only exacerbate Adrian's conditions, leading him back to the rollercoaster of mania and suicidality that he thus far has escaped.[60]

  ii)  **Adrian's Physical Ailments Will Only Worsen with Age and Incarceration**

  Adrian is currently suffering from a variety of ailments that would require intensive medical attention.  Adrian is being monitored for chronic cholesterol issues.  Two years ago, he underwent an angioplasty; the doctor discovered a sixty percent blockage in one artery.[61]  Adrian continues to be monitored; he currently takes Atorvastatin, Losartan, Medformin, Coq10 supplements, and Omega-3 supplements to minimize risk factors for heart failure.  His heart issues may worsen in the future, based on his family history.  The majority of his family members have suffered from heart problems.  Most notably, his father, at the age of fifty-nine, passed away from a heart condition.  His mother lived with a defibrillator before she passed away.

---

[58] Jennifer M. Reingle Gonzalez and Nadine M. Connell, *Mental Health of Prisoners: Identifying Barriers to Mental Health Treatment and Medication Continuity*, 104 Am. J. Public Health 12, at 2330.

[59] Thompson & Eldridge, "Treatment Denied: The Mental Health Crisis in Federal Prisons," The Marshall Project (November 21, 2018), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons ("As of February [2018], the Bureau of Prisons classified just 3 percent of inmates as having a mental illness serious enough to require regular treatment… officials acknowledged that 23 percent [of federal inmates] have been diagnosed with some mental illness.").

[60] *See* Exhibit 14, Letter of Dr. Stephen Quentzal ("[I]f Adrian Alexander were blocked from routine psychiatric care…[he would be] an intensely symptomatic and dysfunctional patient (mania, depression with suicidality, anxiety, stress) who would be unable to care for himself, who would suffer severely, and who would be a profound burden on the prison health care infrastructure.).

[61] Exhibit 16, Sept. 2019 Angioplasty Records.

On November 15, 2022, Adrian underwent surgery for severe spinal stenosis.[62] [63]   Without this surgery, Adrian risked the stenosis worsening to the point of disabling his lower extremities. Adrian continues to suffer spinal and balance issues.[64] [65] Additionally, on January 25, 2023, Adrian underwent surgery for acute prostatitis.[66]   He is recovering from the procedure presently and continues to be monitored for prostate issues.

Adrian's age, family history, his prior angioplasty, and his pre-disposition to heart disease leaves him vulnerable to COVID-19.  While the risk of COVID-19 admittedly has decreased since vaccinations have become widely available, seniors remain uniquely vulnerable to COVID-19. Since October 2022, the United States has seen a rise in COVID-19 hospitalizations among the elderly.[67]  This rise in hospitalization cannot be attributed solely to some part of the population's failure to get a booster.  Seniors are inherently more vulnerable despite full vaccination.[68]  Other district courts have recognized that despite full vaccination and booster shots, the risk from COVID in combination with preexisting conditions is still severe.  *See United States v. Demeo*, No. 17-CR-545 (KAM), 2022 WL 142345, at *3 (E.D.N.Y. Jan. 15, 2022) (modifying sentence to home confinement due to eighty-two year old defendant's age and continued health problems, including surgery for prostate cancer, coronary artery disease, spinal stenosis, hypertension, and high cholesterol).  Adrian understands that he faces substantial physical risk from COVID-19 and his

---

[62] Exhibit 17, Letter of Dr. Patrick O'Leary.
[63] *See also* Exhibit 18, Nov. 2022 Back Surgery Records.
[64] Exhibit 21, March 24, 2023 Report of Ongoing Health Issues.
[65] Exhibit 20, March 2023 Physical Therapy Records.
[66] Exhibit 19, Jan. 2023 Prostate Surgery Records.
[67] Deidre McPhillips, "A Covid-19 'senior wave' is driving up hospitalizations,", CNN, Dec. 23, 2022, https://www.cnn.com/2022/12/23/health/senior-wave-covid/index.html.
[68] UT Southwestern Medical Center, "COVID-19 vaccine's effectiveness diminishes with age, UTSW research shows,", Nov. 29, 2022, https://www.utsouthwestern.edu/newsroom/articles/year-2022/november-covid-19-vaccines-effectiveness.html ("[T]he effectiveness of antibodies [the Pfizer-BioNTech COVID-19 vaccine] generates diminishes as patients get older.").

other physical ailments if he were incarcerated.  To date, he has not been infected with COVID-19, due to his own proactive measures to minimize exposure wherever possible.

The substantial physical risk from COVID-19 is further amplified by the BOP's insufficient medical care for patients like Adrian.  Despite their representations, the BOP has been unable to handle the healthcare needs for its existing inmate population.  This has led to negligence, such as allowing health care providers to practice without valid authorizations.[69]  Adrian, burdened with a complex medical history, would be entering a facility that is already ill-equipped to handle an ordinary inmate's health.  His preexisting conditions will be compounded by the experience of incarceration.  The stresses associated with incarceration often cause individuals to age rapidly, so that their physiological age exceeds their chronological age.[70] These stresses include not only the psychological and physical stress of incarceration, but the inability to access care since the BOP is already overwhelmed by an aging inmate population.  Elderly patients require more frequent trips outside of institutions for their medical care, but the BOP is too understaffed to timely escort prisoners to medical appointments.[71]  One federal institution's prisoners had to wait an average of 114 days for an initial appointment with a medical specialist for cardiology, neurosurgery, pulmonology, and urology.[72]  For additional or routine appointments, this wait time increased to

---

[69] U.S. Department of Justice, Office of the Inspector General, Audit Division, "The Federal Bureau of Prison's Efforts to Manage Inmate Health Care" (Feb. 2008), https://oig.justice.gov/reports/BOP/a0808/final.pdf, at xiv.

[70] K. Skarupski et al, "The Health of America's Aging Prison Population," 40 Epidemiologic Rev. 1 (March 2018); B. Williams, et al., "Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care," 102 Am. J. of Pub. Health 8 (August 2012).

[71] U.S. Department of Justice – Office of the Inspector General, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons" (2016), https://oig.justice.gov/reports/2015/e1505.pdf, at 17.

[72] *Id.* at 16-18.

256 days.[73]  This assumes that prison staff are willing to listen to a sick and elderly inmate; prison staff often lack the training to recognize behaviors stemming from health or memory issues.[74]

Home confinement will restrict Adrian's movements and routine, so that he cannot partake in his normal life, and must remain in the confines of his apartment in New York, while his wife and family continue their lives outside the home.  Respectfully, given Adrian's psychiatric condition, we submit that punishment will be severe enough on Adrian, without burdening the BOP with Adrian's complex medical needs.

### b. Adrian Is Committed to Abiding by the Law, in Light of the Harm Inflicted on the Innocent Victims and His Family by His Misconduct

Adrian deeply regrets the actions that led to victims' harm.  Every day, he turns over how his ambition and tunnel vision harmed other people.  Every day, he is directly confronted with how his ambition and tunnel vision have hurt his family.  Adrian sees how his daughter Allegra has suffered from panic attacks and insomnia since his October 2021 arrest.  He has had to watch his son's mental health decline.  Adrian's experiences since October 2021 indicates that home confinement is sufficient punishment.  He suffers greatly without his family and the freedom of movement that have been the *modus operandi* for most of his life.

Additionally, he regrets that his actions have prevented him from being available for his family members.  His wife Susi is not in the best of health.  As mentioned previously, she was treated for ovarian cancer in 2012 and 2013.  She continues to suffer from a herniated disc and stenosis.  Despite her own health problems, Susi, as the sole breadwinner in the family, has to

---

[73] *Id.* at 18.

[74] *Id.* at 23 (explaining that staff lacked the training to understand that "aging inmates may have a medical reason that explains behavior that would otherwise be subject to discipline." For example, "an anemic, wheel-chair bound aging inmate at a Care Level 2 institution…was disciplined several times for pushing himself inside a building to wait for his medication rather than waiting outside, including in cold weather, to receive it.").

spend most of her year in Italy to operate her family's real estate agency. Susi was alone in Italy when her mother died in July 2022. Adrian could not be with her during her time of grief, which Adrian deeply regrets.

Since October 2021, Adrian has spent most of his time confined to his home. The Court graciously has allowed Adrian to go to Italy three times in the past year to spend time with his family. Each time he went to Italy, Adrian returned to the United States promptly. But for the remainder of his time, Adrian has stayed in New York, often alone, while his family is in Italy for either work, school or the holidays. With Adrian's wife in Italy for most of the year due to work, Gregory and Allegra rely on their father's emotional support and wisdom more than ever.[75] [76]

As a seventy-six year old man, Adrian is acutely aware of the limited time that he has with his wife, children, and father-in-law, who is almost ninety years old. Adrian's positive compliance with the pretrial conditions are indicative of his desire to live a quiet life with his family, where he can be supportive of his family, and focus on paying restitution to the victims in this case. *United States v. Maurer*, 76 F. Supp. 2d 353, 363 (S.D.N.Y. 1999), *aff'd*, 226 F.3d 150 (2d Cir. 2000) (lower sentence justified because defendant was a "model prisoner" and expressed genuine regret).

### c. Adrian's Cooperation in This Case, Even Without the Benefit of a 5K1.1 Motion, was Substantial and Warrants a Sentence of Home Confinement

Attempts to cooperate with the government may be considered as part of a defendant's history and characteristics within 18 U.S.C. § 3553(a), even if the government does not make a § 5K1.1 motion. *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *Garcia v. United States*, No. 04 CR 693(SJ), 2009 WL 3379135, at *1 (E.D.N.Y. Oct. 20, 2009) (downward departure warranted due to limited

---

[75] Exhibit 9, Letter of Gregory Alexander.
[76] Exhibit 10, Letter of Allegra S. Alexander.

involvement in conspiracy, prompt cooperation, difficult personal background, and medical condition, among other factors). How a defendant went about cooperating with the government may "[shed] light…on the character of a defendant." *United States v. Fernandez*, 443 F.3d at 33.

As discussed above, Adrian's cooperation with the government started long before he was named as a defendant in this indictment. When he was first contacted by EDNY prosecutors in June 2017, he advised them through present counsel that he was willing to cooperate fully in their investigation. In response to grand jury subpoenas issued by both the EDNY and SDNY, both of whom were investigating Kalkanis and Dr. Dowd at the time, Adrian spent weeks scanning thousands of documents and painstakingly organized them for easy review by the prosecutors. He presented those documents to the government in a flash drive. We suspect that many of those documents served as the foundation of the government's cases at the two trials presided over by the Court. As of September 2017, Adrian had communicated to both EDNY and SDNY that he was willing to be interviewed by either office or both together. Neither office immediately took him up on his offer to cooperate, but in July 2018, he sat for an interview with an IRS Criminal Investigation agent working with the EDNY who was apparently investigating Dr. Dowd for tax evasion. In his interview with the IRS agent, Adrian willingly, openly and truthfully answered all of the agent's questions, and informed the agent about how the scheme operated. He described that once a case was settled or won, Adrian's litigation funding company, Health Finance LLC, would receive a percentage of the settlement award. In contrast, Adrian explained, Dr. Dowd, among other doctors, received compensation for the surgeries long before the cases were settled — indeed, immediately in advance of the surgeries being performed. During Dr. Dowd's trial, the

government alleged that Dr. Dowd did not report these litigation financing checks on his tax returns, because he knew that these checks were from a fraudulent scheme.[77]

Although Kalkanis and others had been indicted before Adrian met with the IRS agent in the EDNY investigation, the SDNY prosecutors did not attend the IRS interview at which Adrian summarized his own and others' involvement in the scheme.  Nevertheless, after the SDNY had cooperated with Kalkanis and were preparing to try Brian Duncan and others, Adrian was subpoenaed by the SDNY as a witness to authenticate the thousands of records he had provided to them in the course of their investigation of Kalkanis and his co-defendants.  Again, Adrian advised the SDNY that he was prepared to cooperate with their request for testimony, but he was later advised that his assistance was not needed at the May 2019 trial.

After he was indicted, Adrian wasted no time moving forward with his desire to cooperate with the government.  This is reflected in the timeline of Adrian's contacts with the government.  He was arrested on October 19, 2021, and counsel discussed the possibility of cooperation the very next day.  After a series of telephone communications about cooperation with the prosecutors, counsel first met with the government on February 4, 2022, to lay out the facts that Adrian could provide about his and others' involvement in the criminal scheme.  Based on that initial proffer of Adrian's evidence, the government invited Adrian into a series of proffer sessions during which he provided evidence potentially useful to the government in its prosecution of his  co-defendants and others.  From April 1 to August 16, 2022, Adrian and counsel met with the government on five separate occasions.  On each occasion, the prosecutors questioned Adrian for hours at a time.  In late August 2022, once he abruptly learned that the government would not offer him a cooperation agreement, Adrian promptly signed a plea agreement on August 25, 2022, and entered

---

[77] Trial Tr., 1573:3-1588:18 (reviewing Dowd's tax returns).

a guilty plea before the Court on August 30, 2022, making him the <u>first</u> defendant to plead guilty in this case, though being the last to be arrested (months after his co-defendants). Frankly, Adrian was prepared to plead guilty to the charges when he first started discussing cooperation with the prosecution shortly after his arrest. Before and after pleading guilty, Adrian has been respectful and compliant with the pretrial conditions of release imposed on him. Adrian's cooperation with both the government and the Court has demonstrated his willingness to admit his wrongdoing and is undoubtedly a strong indication that he is unlikely to commit anymore criminal acts in his life.

**d. Adrian's Sentence Must Be Favorable in Comparison to Other Defendants, due to his Role in the Scheme and his Cooperation**

"A reasonable explanation" for defendants' differing sentences is the "varying degrees of culpability and cooperation between the various defendants." *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006).

As detailed previously, Adrian has been highly cooperative with the government; his cooperation began in 2017. Most recently, he met with the government on five separate occasions after his indictment. We respectfully submit that Adrian's sentence must reflect his attempts to cooperate with the government, his compliance with the terms of release, his more limited involvement in the scheme, and his acceptance of responsibility. A sentence outside of the Sentencing Guidelines would send a signal that early admission of guilt and cooperation with the government will be recognized and considered in fashioning the appropriate sentence.

Furthermore, as noted above, Adrian was a funder among several funding companies. The fact that other funders exist does not mitigate or undermine Adrian's guilt in this case. Adrian acknowledges that he consciously took part in this scheme by funding fraudulent cases after becoming aware of the fraud. Nevertheless, unlike the government's primary cooperating witness, he was clearly not the architect of this scheme: he became involved unwittingly, but unfortunately chose to continue in this scheme after he learned that his loans were being used to fund unnecessary surgical procedures. Sadly, the record, as described above, reveals that when he abandoned working with Kalkanis, he was easily replaced by other funders, who were also aware that the cases were fraudulent. Among the funders, Adrian is only unique in that he is the only one that was indicted for his admitted knowledge of the fraud.

### e. A Sentence of Extended Home Confinement Will Address the Sentencing Goals of Deterrence and Public Safety.

Adrian has recognized that his past actions were wrong, and he is eager to prove himself through abiding by the Court's orders. Adrian is prepared to make restitution to the insurance companies in this matter, fully acknowledging that the amount of money does not make whole the victims who underwent unnecessary procedures.

Moreover, Adrian is unlikely to pose a threat of reoffending again. He was terrified when the FBI stopped him at JFK in October 2021. He has been deeply regretful that he has not been able to support his family. He feels that he has become a burden on his family due to his ongoing legal problems. The PSR notes that Adrian's children still require his presence and guidance in their lives. *See United States v. Gayle*, No. 09-CR-358, 2010 WL 2540488, at *2 (E.D.N.Y. June 17, 2010) (defendant sentenced to five years' probation for wire fraud, in part because of strong family ties).

Adrian does not pose a threat to public safety. He is statistically unlikely to be a recidivist, based on both his criminal history and his age.[78] These statistics reflect Adrian's state of mind: he is conscious of the limited time he has with his family and friends. He is keen not to make any mistake that would harm another person or jeopardize the remaining time he has left with his family.

Home confinement with electrical monitoring is an effective punishment against a man who longs to spend time with his family, who now spend substantial amounts of time away from him in Europe, Massachusetts, and elsewhere. By any measure, sentencing Adrian to home

---

[78] U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (Mar. 2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview, at 23 (increasing age is closely related with lower rates of recidivism).

confinement would not be a slap on the wrist. He would be subjected to a "hugely restrictive regime of confinement, compliance, intrusion, and dependency"[79] while forced to spend immense amounts of time alone to contemplate his crimes and the harm that his actions have caused. A substantial amount of time in home confinement would send a message underscoring the gravity of the offense, while ensuring that he receives the medical and psychiatric treatment he desperately requires.

## CONCLUSION

We respectfully submit that Adrian be sentenced to an extended period of home confinement, in recognition of his acceptance of responsibility, his extensive, repeated, and timely cooperation with the government, and the unlikely chance that he will offend again. We urge the Court to sentence Adrian with his physical and mental health in mind.

/s/ James G. McGovern
James G. McGovern
Shannon Zhang
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
T: (212) 918-3220
F: (212) 918-3100
Email: james.mcgovern@hoganlovells.com

---

[79] *U.S. v. Coughlin*, No. 06-2005, 2008 WL 313099 (W.D.Ark. Feb. 1, 2008) (sentencing defendant who had pled guilty to five counts of aiding and abetting wire fraud to twenty-seven months of home detention and 1500 hours of community service).