

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 6, 2023

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl St.
New York, New York 10007

      **Re:**    *United States v. Adrian Alexander*, S2 21 Cr. 530 (SHS)

Dear Judge Stein:

      The defendant in the above-captioned case is scheduled to be sentenced on April 13, 2023, at 3:00 p.m. The Government respectfully submits this letter in connection with that sentencing and in response to the defendant's sentencing memorandum, dated March 30, 2023 ("Def. Mem.") For the reasons set forth below, the Government submits that a sentence of 60 months' imprisonment is warranted and would not be greater than necessary to serve the legitimate purposes of sentencing.

**Background**

**I.**    **Offense Conduct**

      A.   <u>Overview of the Fraud Scheme</u>

      From at least 2013 through 2018, the defendant and his co-conspirators participated in a massive Fraud Scheme in which hundreds of individuals staged trip-and-fall accidents and filed fraudulent lawsuits arising from the staged accidents, in which they falsely claimed, among other things, they were seriously injured in the accidents. Certain Fraud Scheme participants, often referred to as "Runners," recruited individuals (the "Patients") to stage or falsely claim to have suffered trip-and-fall accidents at particular locations throughout the New York City area (the "Accident Sites"). In the course of the Fraud Scheme, Runners, which included Kerry Gordon, Bryan Duncan, Robert Locust, Reginald Dewitt, and Ryan Rainford, among others, recruited nearly 500 Patients. *See* GX-1702.[1]

      Common Accident Sites used during the Fraud Scheme included cellar doors, cracks in concrete sidewalks, and purported "potholes" (the "Accident Sites"). In the beginning of the Fraud

---

[1] "Tr." refers to the transcript of the trial in this matter, which commenced on November 28, 2022; "GX" refers to Government exhibits from the November 28 trial.

Case 1:21-cr-00530-SHS   Document 222   Filed 04/06/23   Page 2 of 10

Page **2** of **10**

Scheme, Runners would instruct Patients to claim they had tripped and fallen at a particular location, when in fact the Patients had suffered no such accident. Eventually, Runners began to instruct Patients to stage trip-and-fall accidents, *i.e.*, to go to a location and deliberately fall. The reason for this change was to ensure that the Patients would be transported to the hospital via ambulance and obtain ambulance reports, thereby making their fake accidents appear more legitimate. As described below, Patients recruited into the Scheme were often extremely poor—individuals desperate enough to undergo medically unnecessary surgeries in exchange for small post-surgery payments.

After the Patients staged their trip-and-fall accidents, or falsely claimed to have suffered such accidents, the Runners referred the Patients to one of several lawyers (the "Lawyers"), including George Constantine and Marc Elefant. The Lawyers commenced personal injury lawsuits (the "Fraudulent Lawsuits") against the property owners of the Accident Sites and/or the property owners' insurers (collectively, the "Victims"). The Fraudulent Lawsuits did not disclose that the Patients had either deliberately fallen or never fallen at the Accident Sites, or that they were not seriously injured. Instead, the Fraudulent Lawsuits claimed that the Patients had serious injuries resulting from the falls that were solely caused by the negligence of the owners of the Accident Sites (*i.e.*, the Victims). The Fraud Scheme participants instructed the Patients to claim that they sustained injuries to particular areas of their bodies, including the knees, shoulders, and/or back—body parts that, if injured, reap high recoveries in personal injury lawsuits.

Members of the Fraud Scheme referred the Patients to particular MRI facilities, including an MRI facility owned by Adrian Alexander, the defendant, as well as to certain doctors, including Andrew Dowd and Sady Ribeiro. Dowd and Ribeiro invariably recommended that the Patients undergo surgery, irrespective of any medical need. To obtain MRI referrals, and to substantiate their Fraudulent Lawsuits, the Patients were instructed to receive ongoing treatment from a chiropractor. In addition, Fraud Scheme participants encouraged Patients to attend physical therapy sessions to create the appearance of serious bodily injury. For example, in a March 2015 email, Duncan, one of the Fraud Scheme's main participants, explained to Alexander that having Patients attend physical therapy sessions was necessary "when it comes to painting a picture of the client being hurt." (GX-446).

Patients were informed that if they intended to continue with their Fraudulent Lawsuits, they would need to undergo surgeries to increase the value of the Fraudulent Lawsuits. The medical procedures included discectomies, spinal fusions, knee and shoulder surgeries, and non-surgical epidural injections. As an incentive to undergo these surgeries, the defendants and their co-conspirators usually arranged for payments, in the form of high-interest loans, to be made to the Patients each time they had surgery — typically between $1,000 and $1,500 per surgery ("Post-Surgery Payments").

The Patients who were recruited into the Fraud Scheme were typically poor — individuals desperate enough to submit to surgeries in exchange for the small Post-Surgery Payments. As much as 40% of the Patients were from homeless shelters in New York City. It was also common for Patients to ask for food or money when they would appear for their intake meetings with the Lawyers. Many of the Patients struggled with maintaining basic hygiene or controlling addictions, and often smelled of alcohol and/or marijuana. Because most Patients did not have the means to

pay for transportation, Runners transported the Patients to their various medical and legal appointments. Runners frequently dropped off carloads of Patients at a time at these appointments.

In addition to the Post-Surgery Payments, the Patients were induced to participate in the Fraud Scheme by promises that they would receive a percentage of any settlement payments from their Fraudulent Lawsuits. The Patients' medical fees were invariably paid for by litigation funding companies (the "Funding Companies"), including a funding company owned by Alexander, even if the Patient maintained medical coverage through an insurance company or a government-subsidized program. In exchange for funding Patients' medical and legal costs, the Funding Companies charged the Patients high compounding interest rates, sometimes up to 50% on medical loans and up to 100% on personal loans. The interest rates were so high that oftentimes most of the proceeds that were awarded in the Fraudulent Lawsuits were paid to the Funding Companies, Lawyers, doctors, and Fraud Scheme organizers, with the Patients receiving a much smaller percentage of the remaining recovery.

In or about 2015, certain members of the Fraud Scheme split from the original conspiracy and formed a separate conspiracy that operated in substantially the same manner. Specifically, Kalkanis, one of the leaders of the Fraud Scheme, had a falling out with Alexander and Constantine, and split off from the group to form a new conspiracy. Following the split, Alexander continued with most of the existing cases and worked with Duncan and Gordan to recruit new fraudulent cases.

### B. The Defendant's Role in the Fraud Scheme

Alexander owned one of the primary Funding Companies, Health Finance, that funded legal and medical expenses in furtherance of the Scheme. All of the medical treatment, including surgery, MRIs, physical therapy, and treatment from the chiropractors, was paid by the Funding Companies. Payments for each surgery were typically between approximately $10,000 and $30,000. Payments for chiropractic treatments were typically $1,500. Referral fees were also paid to the Patients' "case mangers" each time a Patient signed a funding agreement. The referral payments, also referred to as "medical management fees," were typically between $1,000 and $2,500. The Funding Companies also paid for the Post-Surgery Payments to the Patients. In exchange for financing the medical treatment and personal loans, Health Finance (and the other Funding Companies) charged the Patients high interest rates and, as a result, received a significant percentage of any recovery obtained in the Fraudulent Lawsuits.

As one of the primary funders, Alexander worked closely with the case managers – Kalkanis and then Duncan and Gordon. In deciding whether to fund cases, Alexander closely scrutinized case summaries and medical reports. Alexander also closely monitored the cases he funded. He routinely had lengthy discussions with the case managers, asking them questions and directing them to obtain records in support of the Fraudulent Lawsuits. *See, e.g.*, GX-467 (Alexander emailing Constantine, Gordon, and Duncan, "Sophia constant – needs to be brought to Sady; . . . Tanisha Lewis needs better pics; Anthony Acevedo, Cesar Thomas, reshawn banks, Eunice Chriscow need accident location and better pics").

Alexander also scrutinized photographs of Accident Sites, often directing the case managers to obtain new or different photographs. Recognizing the fraudulent nature of the

lawsuits, Alexander sometimes directed Gordon and Duncan to take photographs of random potholes, unrelated to a Patient's alleged trip and fall. (Def. Ex. A, Dkt. No. 219-24 at 8).

Alexander, who was laser focused on earning a profit, frequently identified weaknesses in the Fraudulent Lawsuits and, in particular, red flags that could reveal the fraudulent nature of the lawsuits. For example, in a May 8, 2015 email exchange with Duncan, Alexander complained about an inconsistency between a Patient's emergency room report, in which the Patient complained of a left shoulder strain, and Ribeiro's preoperative report, which recommended surgery for a bulging disc. (GX-452). Duncan responded that he was not concerned about the inconsistency because the Patient "started treatment [and] subsequently . . . 'claimed' his lower back as a primary area of concern. As long as it is documented . . . prior to Sady's initial consult a strong and almost irrefutable argument can be made that his back was injured from day one." *Id.* In an April 10, 2015 email about Dexter Baldwin, who testified at the November 2022 trial that he participated in the Fraud Scheme and staged an accident, Alexander wrote to Duncan, "I am sure you realize I want to do these deals; I am just trying to see how we can, without getting in trouble."[2]

Alexander also profited from the Fraud Scheme through an MRI facility that he owned and operated ("MRI Facility-1"). Alexander pushed the case managers to send Patients to MRI Facility-1. Kalkanis agreed to send patients to MRI Facility-1 given Alexander's financial interest in the Fraudulent Lawsuits and his expectation that MRI reports from that facility would be positive. (Tr. 1650). As a result, prior to the split in 2015, most of the Patients received MRIs from MRI Facility-1. And almost all the MRIs generated from MRI Facility-1 were "positive" for a condition requiring surgery. (Tr. 426, 1110, 1112, 1650). At the November 2022 trial, Dr. Neil Roth testified about red flags he observed in the Patients' MRI reports, some of which were from MRI Facility-1. For example, Dr. Roth testified that the most common MRI impression in the Patient files was an anterior inferior quadrant labral tear and that such an impression is generally not expected for a trip-and-fall injury. (Tr. 1112). Further, given that these Patients were not seriously injured, it is clear that MRI Facility-1's reads were unjustified or, at the very least, overly aggressive.

## II.  Procedural History

Superseding Information S2 21 Cr. 530 (SHS) (the "Information") was filed on August 30, 2022, charging the defendant one count of participating in a wire fraud conspiracy from in or about

---

[2] In his objections to the PSR, Alexander claimed that "getting in trouble" was a reference to "monetary" trouble, not legal trouble. (PSR at 26). This *ex-post*, self-serving attempt to recharacterize an unambiguous email is not persuasive. First, Alexander's email related to a fraudulent case. Dexter Baldwin, a heroin and crack dealer who was recruited into the Fraud Scheme from a public housing project, testified that he staged his accident. (Tr. 1379, 1399). Second, when Alexander expressed concern about the prospect of losing money in other emails, he was much more explicit. *See, e.g.*, AA_USAO_00392505 ("Don't understand? Did we lose money in this"); AA_USAO_00405194 ("Yes, the first year we lose money and we cover by some of capital raised-it is normal as we start up the engine."); GX-467 ("Without your assistance these cases are write offs which obviously cannot afford.").

2013 to April 2018, in violation of 18 U.S.C. § 371. (PSR ¶ 2). On that same day, the defendant pled guilty to the Information with the benefit of a plea agreement.

The Probation Office calculated the applicable Guidelines in the same manner as set forth in the parties' plea agreement. The offense calculation for the defendant is as follows:

**Base Offense Level:** Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is six. Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), 20 points are added because the intended loss was greater than $9,500,000, but less than $25,000,000.

**10 or more Victims:** Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), two points are added because the offense involved ten or more victims.

**Vulnerable Victims:** Pursuant to U.S.S.G. § 3A1.1(b)(1), two points are added because the defendant knew or should have known that a victim of the offense was a vulnerable victim.

**Acceptance of Responsibility**: Pursuant to U.S.S.G. §§ 3E.1.1(a) and (b), a three-level reduction is warranted because the defendant has clearly demonstrated acceptance of responsibility.

The defendant is assigned to Criminal History Category I. (PSR ¶ 61). Accordingly, as stipulated in the parties' plea agreement, the Guidelines range is 87 to 108 months' imprisonment. (PSR ¶ 101). Because the statutory maximum term of imprisonment is below the minimum of the Guidelines range, the statutory authorized maximum sentence of 60 months is the Guidelines sentence. The Probation Office recommends a sentence of 50 months' imprisonment. (PSR at 30).

## Discussion

As set forth above, Alexander was a critical member of the Fraud Scheme. The defendant provided the funding for medical treatment and procedures, such as physical therapy and surgeries; funding for the Post-Surgery Payments to induce Patients to undergo medially unnecessary surgeries; and funding for management fees for the case managers who oversaw the Fraudulent Lawsuits from start to end and who paid the Runners to recruit people into the scheme. Alexander also owned one of the primary MRI facilities that generated "positive" readings forming the basis for unnecessary medical treatment. For *five years*, Alexander had his hand in almost every aspect of this horrific fraud scheme. A term of imprisonment of 60 months is necessary to reflect the seriousness of the defendant's conduct and to deter sophisticated white collar criminals like Alexander from engaging in similar criminal activity.

*First*, a Guidelines sentence of 60 months' imprisonment is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

The defendant's criminal conduct in this case was abhorrent. Alexander and his conspirators preyed on patients who were so desperate for quick cash that they would undergo multiple unnecessary surgeries in exchange for the small Post-Surgery Payments of $1,000-$1,500. For a period of *five years*, the defendant and his conspirators exploited these vulnerable

members of society, such as drug addicts and the homeless, for personal gain. While Alexander did not have face-to-face interactions with the Patients, he was aware that they were destitute. (Def. Mem. 19; GX-442). He knew they were so desperate for cash that they would subject themselves to unnecessary surgeries for small, $1,000 loans. He even proposed $200 stipends to induce Patients to go to medical appointments. (Tr. 473-475). To Alexander, the Patients (and their bodies) were nothing more than objects that he and his wealthy investor friends could use to make a profit.

To make the Fraudulent Lawsuits more valuable, Alexander pressed for more surgeries.[3] On the rare occasion when one of the several crooked doctors involved in the Fraud Scheme did not recommend surgery, Alexander would direct the case managers to send the Patient to another doctor. For example, in a May 2015 email to Alexander (after Alexander split from Kalkanis), a doctor wrote about a particular patient: "I do not think this patient is a surgical candidate." (GX-450). Alexander forwarded the email to Duncan and Constantine and directed them to take the Patient to another doctor and quipped, "nothing is done until [it's] done."

The Fraud Scheme was especially pernicious because Alexander's company, Health Finance, like other Funding Companies, further exploited the Patients by charging them with high interest rates. Patients, who were often poorly educated, typically did not understand the funding agreements and did not realize they would only receive a small portion of the large recoveries they were promised until it was too late. *See* GX-453 (Alexander discussing "how clients when it comes to settlement time . . . say: 'I did not realize I owe [Health Finance] so much money, you (attny) should have protected me etc etc etc,'" and directing others to have Patients initial the payout tables in funding agreements). For example, in the May 2018 trial, Patient Clarence Tucker testified that his case settled for $100,000, and he only received $19,000. (2018 Tr. 562). Kasheem Jones testified that his case settled for $225,000, and he only received $35,000, and his girlfriend Colette Ford's case settled for $250,000, and she only received $55,000. (2018 Tr. 600, 604). Carol White testified that her case settled for $80,000, and she only received $6,000. (2018 Tr. 686). Alvin Martin testified that his case settled for $120,000, and he only received $40,000. (2018 Tr. 1300). In the November 2022 trial, Patient Dexter Baldwin testified that his Fraudulent Lawsuit settled for approximately $100,000 (without his knowledge or consent) and he received only approximately $30,000. (Tr. 1400). Malik Walker (who underwent unnecessary spinal

---

[3] The surgeries and medical procedures had the potential to cause grave harm to the Patients. At the November 2022 trial, the Government's expert, Dr. Roth, explained that there are always risks "[e]ven in the most minimally invasive surgical procedures." (Tr. 1088). Dr. Roth went on to explain, "You still have a risk that comes with any time you go under anesthesia, which could cause respirator problems, you could get an infection, you could have pain afterwards that is significant . . . ." Dr. Roth explained that, in addition to the risk of doctor error, which is not insignificant, "there are systemic risks . . . for something like a blood clot[,] which can go into your heart and cause strokes, it can cause a heart attack. So there are plenty of risk that occur with a simple procedure." (Tr. 1088). Dr. Roth testified that surgery is a "stressor" to the body and has the potential to "bring out something that . . . would not normally come out." (Tr. 1089). Even the most minimally invasive procedure is a traumatic event for the body, Dr. Roth testified. (Tr. 1089).

surgery) testified that he was promised $250,000, his case settled (without his knowledge or consent) for $100,000, and he received only $10,000. (Tr. 862-863). Alexander and the other Funding Companies exploited the Patients' lack of financial literacy to line their pockets.

In addition to exposing Patients to the risk of grave physical harm for modest payouts, Alexander exposed his investors to serious financial risk. Alexander intentionally concealed from his investors the fraudulent nature of the Patients' cases, exposing the investors to enormous downside risk. In email correspondence and investor presentations, Alexander referred to the "high-yield" investment as relatively safe. They were not. Similarly, when he sold some of the cases to other Funding Companies, Alexander did not disclose that most of the cases were fraudulent or that Kalkanis had forged Patient signatures.

The stipulated Guidelines sentence of 60 months' imprisonment accurately reflects the serious nature and scope of Alexander's criminal conduct. The defendant played a central role in the Scheme: he was the money man. He provided the funding for chiropractors, MRIs, physical therapy, and surgeries – all critical aspects of the scheme. In his capacity as a funder, Alexander had visibility into nearly every aspect of the Fraud Scheme, including the enormous losses sustained by victim insurance companies and property owners. Unlike some of the other Fraud Scheme participants, Alexander was acutely aware of the value of each lawsuit and the settlement amounts. Thus, Alexander is differently situated from Ribeiro, for example, who was unaware of the Fraudulent Lawsuits settlement amounts.[4] The Guidelines also accurately capture the scope of the Fraud Scheme, which involved 10 or more victims, and that the defendant knowingly exposed others to a risk of harm.

*Second*, a Guidelines sentence of 60 months' imprisonment is needed to afford adequate deterrence to other sophisticated and calculating criminals like Alexander from similar criminal conduct. As this Court previously noted, these types of schemes are not uncommon. During Bryan Duncan's January 7, 2020 sentencing hearing, the Court observed that "[t]here are a number of these conspiracies out there[,] and I'm concerned about general deterrence, about other people understanding that you'll pay a heavy price if you prey on vulnerable people and subject them to . . . a risk of injury or death." *United States v. Bryan Duncan*, 18 Cr. 289, Dkt. No. 252, 12-13; *see also* 18 Cr. 289, Dkt. No. 250, 19 ("You're not the only guys to figure out that you could take advantage of desperate people and make some money in this way, with false slip-and-falls. So I think general deterrence is a really relevant factor here.").

General deterrence is a particularly weighty consideration here given Alexander's role as a litigation funder. This case provides a window into the dark world of litigation financing. To be clear, oftentimes litigation financing is critically important to litigants who are without the means to avail themselves of the judicial process. But there has been widespread reporting about unscrupulous litigation funders such as Alexander. *See e.g.*, Matthew Goldstein, Jessica Silver-Greenberg, *How Profiteers Lure Women Into Often-Unneeded Surgery*, N.Y. Times, April 14, 2018; Ken Belson, *Widespread Deceptive Practices May Reduce Payouts in N.F.L. Concussion*

---

[4] At the March 23, 2023 sentencing of Sady Ribeiro, the Court justified its downward variance on, among other things, Ribeiro's "lack of involvement in the underlying lawsuits in this litigation." (March 23, 2023, Tr. 36).

*Settlement*, N.Y. Times, Sept. 19, 2017. Holding litigation funders responsible for unlawful practices presents a host of challenges and it can be difficult for law enforcement to detect and prosecute such conduct. Unlike participants who are more involved in the day-to-day handling of fraudulent lawsuits, funders operate in the background, from a safe distance, letting other co-conspirators do the dirty work and expose themselves to the risk of criminal prosecution. In the event they are caught, criminals like Alexander can far more easily resort to plausible deniability and say they did not have knowledge of the fraud. In cases, such as this, where a litigation funder is successfully convicted, it is all the more important to send a message to others in the industry. A substantial term of incarceration is necessary to deter other unscrupulous actors in the litigation funding space. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

The arguments and mitigation cited by the defendant do not support the defendant's request for no jail time.[5] Alexander argues that he was "slow to realize the fraudulent nature of the cases." (Def. Mem. 15). He claims that he did not come to understand the fraudulent nature of the lawsuits until November of 2014. As an initial matter, during a proffer session with the Government, Alexander stated that "sometime in 2013" he had realized that there were unnecessary surgeries. In any event, even accepting as true Alexander's assertion that he did not realize at first the nature of the fraud scheme, it is undisputed that after he learned of the fraud, he remained an active participant in the scheme for *several years*. For example, email correspondence shows that in the summer of 2015 – more than a year after Alexander allegedly discovered the fraud and after he split from Kalkanis – Alexander was pushing cases to surgery. Surgeries he knew were medically unnecessary. *See, e.g.*, GX-469 (In an email to Duncan, Gordon, and Constantine (among others), Alexander sent a list of patients and wrote, in part, "Indicate which ones are candidates for open surgery so we can plan for it."). And he continued to push settlements in cases that he knew to be fraudulent. After the split with Kalkanis, Alexander continued the fraud scheme with Gordon and Duncan. As Gordon testified, it was business as usual after the split. (Tr. 459-461). Gordon and Duncan recruited fraudulent cases and Alexander funded them. In other words, Alexander did not continue the fraud simply to dig himself out of a hole. He doubled down, funded new cases, and continued to rake in fraudulent proceeds.

Alexander argues that his age and health warrant leniency. These are facts that the Court can and should consider in imposing sentence. But, as is often the case, these considerations do

---

[5] Also, the proffered mitigation, *e.g.*, Alexander's age and attempt to cooperate, are sufficiently captured by the plea agreement, which generously provides for a five-year statutory maximum.

not outweigh the defendant's horrific conduct. Also, the defendant's age is not necessarily mitigating. Unlike the Runners and Gordon and Duncan who were uneducated and in their 20s or 30s, Alexander is a Harvard graduate who was in his 60s when he engaged in the offense conduct. He had the experience and wisdom to know better. Yet, he chose to engage in a massive fraud scheme for years. Properly considered, Alexander's age should be considered an aggravating factor.

So is his criminal history.[6] In 1982, Alexander pled guilty in this District to two counts of securities fraud. (PSR ¶ 59). Alexander and others used their positions at Morgan Stanley and Kuhn Loeb & Company to feed material non-public information about takeover bids to others who traded on the information. *See* Thomas C. Hayes, *Insider Case Indictment is Dropped*, N.Y. Times, May 21, 1981. The defendants, including Alexander, were accused of sharing in profits totaling approximately $600,000. *Id.* Alexander cooperated with the Government and ultimately served none of the 39 months' imprisonment to which he was sentenced. (PSR ¶ 59). In 2000, the SEC filed a civil complaint in this District against Alexander and others, alleging insider trading. *SEC v. Adrian A. Alexander et al.*, 00 Cv. 7290 (LTS). The SEC alleged that Alexander obtained material non-public information from his then girlfriend and now wife, who was the Manager of Investor and Public Relations for Luxottica S.p.A., about Luxottica's plans to launch a tender offer for U.S. Shoe, and that Alexander tipped others, including his business partner and friends, who traded on the information. In 2005, Alexander agreed to a judgment in which he neither admitted nor denied the allegations, and he agreed to pay a $420,195 fine. *See* https://www.sec.gov/litigation/litreleases/lr19100.htm.

Alexander is no stranger to white collar criminal and regulatory enforcement proceedings. While he attempts to portray himself as "business-oriented" and focused on "spreadsheets" and "cashflow," Alexander should have known, more than most, the potential consequences of engaging in unlawful business practices. But his multiple prior interactions with law enforcement and regulators (and the prior leniency he received) were insufficient deterrents. Alexander has moved from one fraud scheme to the next, illegally profiting off of others. The Court's sentence should send a message that this type of chronic fraud will not be tolerated.

Alexander also contends that he has been cooperative with the Government and law enforcement at every stage of this investigation and prosecution. To be sure, Health Finance produced business records, as it was legally obligated to do, in response to a 2017 grand jury subpoena and agreed to authenticate those records for the May 2018 trial.[7] After being charged in

---

[6] Alexander's criminal history also distinguishes him from Ribeiro, who had no criminal history. *See* March 23, 2023 Ribeiro Sent'ing Tr. 36.

[7] It also appears that Alexander agreed to be interviewed by an IRS agent in connection with an investigation in the Eastern District of New York. As the Government understands it, that investigation was focused on Dowd's underreporting of income, some of which was derived from his participation in the Fraud Scheme. Alexander was merely a witness (not a target or subject) of the Eastern District's investigation. While the Government understands that Alexander responded to questions in connection with the Eastern District's investigation and told Eastern District prosecutors that he would meet with investigators from the Southern District, it does not appear

this case, Alexander explored cooperation, meeting with the Government and law enforcement on five occasions. While the Government credited much of the information Alexander provided, the Government did not credit everything. The Government could not reconcile some of Alexander's information, which tended to minimize his conduct, with other evidence and testimony. In short, Alexander's post-indictment attempt to cooperate did not advance the Government's investigation, and the Government did not credit all of the information Alexander proffered.

## Conclusion

The defendant committed an egregious, systematic fraud for five years. A term of imprisonment of 60 months is warranted. In addition, the Government respectfully requests that the Court order the defendant to pay $3,928,133.60 in restitution, and to forfeit $659,001 in United States currency, consistent with the plea agreement.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Nicholas Chiuchiolo
Alexandra Rothman
Nicholas Folly
Danielle Kudla
Assistant United States Attorneys
(212) 637-1247

Cc:   Defendant (by ECF)

---

that Alexander implicated himself in any type of misconduct. Alexander disclosed neither the fraudulent nature of the Fraud Scheme nor his knowing involvement in it.