UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

GEORGE CONSTANTINE ET AL.,

Defendants.

21-CR-530 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

Having been found guilty by a jury in December 2022 of two counts each of mail and wire fraud and two counts of conspiracy, defendant Andrew Dowd moves this Court for a judgment of acquittal pursuant to Fed. R. Crim. Pro. 29(c). Dowd alleges that the evidence presented at trial was not legally sufficient to permit a rational juror to find beyond a reasonable doubt that Dowd knowingly participated in the charged trip-and-fall scheme.

The Court finds that the evidence, taken in the light most favorable to the Government, was plainly sufficient to permit a rational juror to find beyond a reasonable doubt that Dowd possessed the requisite knowledge for a guilty verdict. Dowd's motion is denied.

1. **The Conspiracy**

Dr. Andrew Dowd is an orthopedic surgeon who has been found by a jury to have participated in an elaborate and extensive fraud scheme. From 2013 to 2018, hundreds of individuals were recruited to serve as alleged "victims" of orchestrated trip-and-fall accidents in order to obtain millions of dollars in personal injury damages from property owners and their insurance carriers. Five defendants who planned and operated the scheme were indicted in April 2019 for conspiracy to commit mail and wire fraud. Defendant Peter Kalkanis managed the conspiracy, while defendants Kerry Gordon, Bryan Duncan, Robert Locust, and Ryan Rainford served as "runners" who identified accident sites, recruited patients, transported them to and from medical and legal appointments, and instructed the patients how to fake injuries. Kalkanis and Gordon pleaded guilty before trial, and Duncan, Locust, and Rainford were each found guilty following a jury trial in May 2019.

Two years later, in August 2021, the Government indicted another set of five defendants in connection with their participation in the scheme: attorneys George Constantine and Marc Elefant were indicted for allegedly filing fraudulent lawsuits on behalf of the recruited individuals to obtain personal injury settlements, while loan provider and owner of an MRI facility Dr. Adrian Alexander, as well as Drs. Sady Ribeiro and Andrew Dowd, were charged with performing unnecessary medical procedures, including surgeries, on the participants in order to inflate the settlement values of the personal injury lawsuits. Defendants Alexander, Ribeiro, and Elefant each pleaded guilty

prior to trial, while defendants Constantine and Dowd were tried in December 2022 and found guilty by a jury.

## 2. Legal Standard

Fed. R. Crim. Pro. 29(c)(2) permits the Court to "set aside the verdict and enter an acquittal" after the jury has returned a guilty verdict. In adjudicating such a request, the Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (citation omitted). The Court must "view the evidence presented in the light most favorable to the government," and "all permissible inferences must be drawn in the government's favor." *Id.* The jury having already found beyond a reasonable doubt that the Government did prove its case, Dowd now faces a "heavy burden" to overturn that conclusion. *United States v. Tusaneza*, 270 F. Supp. 2d 422, 423 (S.D.N.Y. 2003), *aff'd*, 116 F. App'x 305 (2d Cir. 2004) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)). The verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Defendant argues that the Government failed to meet its burden as to one element: that Dowd willfully and knowingly participated in the staged accident scheme, meaning he 1) intended to participate in the scheme and 2) had knowledge of its general scope and purpose as well as its fraudulent nature. (Court's Jury Charge, Tr. 2584-2589; 2604-2610); *see United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003); *United States v. Reyes*, 302 F.3d 48, 53-54 (2d Cir. 2002). As to the knowledge element, the Government was able to prove its case through evidence that Dowd actually knew of the scheme's general scope and purpose and fraudulent nature, or through evidence that Dowd consciously avoided that knowledge. *Reyes*, 302 F.3d at 53-54. To prove conscious avoidance, the Government needed to show beyond a reasonable doubt that 1) Dowd subjectively believed there was a high probability that the injuries were false and in service of filing fraudulent lawsuits, and 2) that Dowd took deliberate actions to avoid learning of that fact. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011); *United States v. Goffer*, 721 F.3d 113, 128 (2d Cir. 2013).

As far as what the Government was permitted to introduce to prove this element, "[c]ircumstantial evidence can be as compelling as direct evidence and a conviction can rest solely on circumstantial evidence." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). In particular, since "conspiracy by its very nature is a secretive operation, the elements of a conspiracy may be established through circumstantial evidence." *United States v. Chang An-Lo*, 851 F.2d 547, 554 (2d Cir. 1988) (internal citation omitted).

### 3. The Evidence Presented at Trial

#### a. Intent to Participate

The Government presented amply sufficient evidence to permit a rational juror to infer that Dowd intended to participate in a criminal scheme. "The government must first prove the defendant intended to engage in the charged scheme. Here, the prosecution needed to prove beyond a reasonable doubt that [plaintiff] knew the . . . conspiracy existed and that he knowingly and willingly joined in it." *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002). "Once the conspiracy has been shown to exist—as has been conceded—evidence sufficient to link another defendant to it need not be overwhelming, and may be proved entirely by circumstantial evidence." *Id.*

In *Reyes*, the defendant was found by a panel of the Second Circuit to have had the requisite intent to participate in a conspiracy to sell stolen airbags, even if he only consciously avoided the knowledge that they were stolen. As here, the conspiracy had been proven and the other participants charged and convicted. *Id.* at 50. The evidence that the appellate court found supported a finding of Reyes's intent was that Reyes had admitted to referring to Percan – the manager of the scheme – both buyers and sellers of secondhand airbags, and to providing translation services to facilitate Percan's sales. *Id.* at 55. Reyes had received 14 checks totaling $17,000 from Percan's business; on one occasion he had dropped off a set of undocumented airbags in "the manner that thieves would" according to another participant in the scheme; and although Percan "conducted some legitimate business, [witnesses testified that] stolen airbags comprised nearly all of the general market for secondhand airbags and nearly all of [Percan's] business." *Id.* The court held that, "[g]iven that Reyes earned approximately $17,000 from a business that consisted mostly of stolen airbag sales and that he delivered a set of airbags to [Percan's business] in the manner of an airbag thief, a reasonable jury could infer that he intentionally participated in stolen airbag transactions that were part of Percan's illegitimate activities." *Id.*

The facts here are analogous. Dowd was an essential player in the scheme to defraud insurance companies, regularly communicating with the manager of the scheme – Kalkanis – and coordinating with the runners who delivered patients and paperwork to Dowd. He provided appointments, undertook limited questioning of the patients, supplied medical documentation and performed hundreds of unnecessary surgeries that were crucial to the success of the scheme. Dowd received numerous checks from Kalkanis for his work. He conducted himself in "the manner that thieves would" when it came to patients referred by Kalkanis: he knew patients referred by Kalkanis were coming from runners and he paid patient referral fees to Kalkanis in exchange for the referrals, even though doing so risked his medical license. (Tr. 1025, 1656-57, 2012, 2170.) He falsified medical reports by reporting having performed certain tests that he did not do. He did not report more than half of what he was paid by Kalkanis to the IRS. Dowd even asked one patient if he "want[ed] [] a scar on [his] knee or [if he wanted] the full surgery." (Tr. 832:19-22.) Finally, the circumstances

under which these patients came to and dealt with Dowd bore various suspicious hallmarks of fraudulent claims, detailed further below, and nearly all of the patients referred to Dowd by Kalkanis were claiming injuries that were non-existent. Given that Dowd received $3.2 million in $10,000 checks (Tr. 2345:10-12) from a scheme that consisted almost entirely of patients with fake injuries, and behaved in the manner of a doctor who knew the injuries were fake, a reasonable jury was entitled to infer that he intentionally participated in diagnosing and treating patients with fake injuries that were part of the scheme to defraud insurance companies.

### b. Knowledge of the Nature of the Scheme

The Government also presented sufficient evidence for a rational juror to infer that Dowd knew of the nature of the scheme, either through actual knowledge or conscious avoidance. A rational juror could certainly infer that Dowd, at the very least, subjectively believed there was a high probability that the injuries were false and in service of filing fraudulent lawsuits.

The jury heard testimony from several patients themselves as well as from an orthopedic expert that the nature of Dowd's appointments with these patients were inconsistent with typical orthopedic appointments, and consistently atypical across patients. Each of the patients involved in the scheme met with Dowd only once before surgery, was not physically examined, was not presented with any alternatives to surgery, and was not assessed for risk factors before surgery. (Tr. 159, 161, 163, 307-08, 440, 830, 1111-16, 1332, 1962-63; GX1253Z, 1031Z, 1465Z, 1341Z, 1027Z.) The only patient who testified that Dowd offered him an alternative to surgery was not asked by Dowd if he would prefer a less invasive procedure, but rather was asked if he wanted the surgery or only a scar to make it *look* as though he had surgery. (Tr. 832-33, 1169.) Sometimes, runners would even sit in on these patients' appointments, (Tr. 440:4-18), and having communicated with the same runners across scores of patients, who were normally brought to Dowd's offices by the carload, Dowd could hardly have mistaken the runners for friends or family members of the patients.

The Government's expert, whom a rational juror could have credited, testified based on his review of Dowd's patient files that Dowd's initial exam notes described these patients' "injuries" in both a consistent and a thoroughly generic manner, and gave diagnoses that had no clinical meaning. (Tr. 1075-76, 1108, 1112-20, 1128, 1144; GX 827 (and corresponding patient files), 901, 907, 908, 1280Z, 1497Z.) The jury saw documents showing that Dowd consistently would order an MRI under the auspices of determining whether surgery was warranted, but would then quickly schedule surgery and receive payment from funding companies for surgery even *before* reviewing the results of the MRI. (Tr. 2337:24-2340:9.)

Additional emails and text messages in evidence certainly suggest that Dowd was aware of the purpose of the scheme and his role in it; specifically, to inflate the value of repeated settlements with insurance companies. For example, Kalkanis reminded Dowd in

4

writing that lawyers like Elefant "cannot put numerous cases into suit without your vital reports." (Tr. 956.) Kalkanis asked Dowd to change his report about a patient to say specific things about that patient's condition that he had not previously written, and Dowd complied. (Tr. 959:20-961:21, 2344:4-23.) Dowd even appears to have assisted Kalkanis in finding lawyers to participate in the scheme, saying in a text to Kalkanis: "I have two other attorneys in mind who could also be trusted to keep their word and might be prepared to move quick . . . I think we would have more control with Victor." (Tr. 1680:17-21.)

Even if a juror were inclined to find Dowd did not actually know the nature of the scheme, there was ample evidence from which that juror could conclude that Dowd took deliberate actions to avoid learning of it.

First, the patients that were referred to Dowd through Kalkanis, for a fee which his professional rules did not permit him to accept, were visibly distinct. These patients arrived by the carload, (Tr. 438-39, 450, 1332-33; GX1341Z, 1024Z, 1492Z), frequently smelling of body odor and substances – alcohol or marijuana – and caused disturbances in the parking lot or Dowd's waiting room. (Tr. 394-96, 444-49.) But Dowd asked no questions as to where these patients were coming from, and to Kalkanis's delight, "offer[ed] no resistance whatsoever. He examines the patient, gets a surgical clearance, and surgery completed within a week's time." (Tr. 1939:22-1941:1.)

Jurors could also rationally infer from the testimony of the Government's orthopedic expert and from Dowd's extensive experience that Dowd understood the injuries claimed by the patients were inconsistent with trip-and-fall accidents. (Tr. 1113, 1138-44.) Nearly all of the patients referred by Kalkanis purported to have the same injuries (cracking, popping, and clicking sounds, and internal derangement of the right knee) under the same circumstances (a trip and fall at or near a business, sometimes a few on the same date, where there normally were no cameras to record the accident) and experience the same level of pain (7-8, on a scale of 1-10). (Tr. 2327: 1-13; 2335:15-22; 2336:17-2337:13.) By failing to conduct even basic physical exams, Dowd avoided confirming that these patients were not injured at all. (Tr. 159, 161, 163, 307-08, 440, 830, 1111-16, 1332, 1962-63; GX1253Z, 1031Z, 1465Z, 1341Z, 1027Z.) And Dowd's failure to actually review the MRI images taken of these patients' "injuries" before recommending that they have surgery certainly suggests Dowd was affirmatively choosing not to determine whether or not surgery was needed before recommending the patient undergo surgery. (Tr. 441, 1080, 1148-52, 1155-59, 1652, 2161; GZ 901, 907, 908, 1032Z, 1341Z.)

Dowd argues that because there is no evidence that a patient *told* him directly that his or her accident was staged, no jury could find that Dowd had knowledge of the nature of the scheme, or even that he consciously avoided it. But the law does not require such explicit evidence, for "conspiracy, by its very nature, is characterized by secrecy," and a "mutual understanding . . . may be unspoken." Sand, et al., *Modern Federal Jury Instructions*, Instr. 19-4; Tr. 2602; *see, e.g., United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980)

5

(affirming jury finding of conspirator's knowing participation because "[i]t is a rare case indeed where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel. A conspiracy by its very nature is a secretive operation."). It is undisputed that the runners instructed the patients to lie to Dowd about their injuries, but based on the other evidence, a jury could reasonably infer that Dowd was aware of this arrangement, and that its purpose was for Dowd "to be able to say, should he be apprehended, that he did not know," which is precisely the "deliberate avoidance of positive knowledge" that can serve as "the equivalent of knowledge" for a finding of conscious avoidance. *United States v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974) (quoting approvingly jury instructions on conscious avoidance given by the district court). Indeed, multiple patients testified that they were left with the impression that Dowd knew their injuries were fake after seeing him. (*See, e.g.*, Tr. 833:4-7.) One patient stated: "I didn't think I had to lie to the doctor; I didn't think I had to lie to anyone . . . because everyone was in on the scam. Everyone." (Tr. 360:23-361:7.)

This evidence is not for the Court to disregard. Based on this evidence, a reasonable jury was certainly entitled to infer that Dowd either knew or consciously avoided knowing the nature and purpose of the scheme alleged in the indictment, and knowingly and intentionally participated in it.

Dowd contends that here, "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," and therefore "a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)). Viewing the aforementioned evidence at trial in the light most favorable to the prosecution, this Court disagrees that the evidence gives "equal or nearly equal circumstantial support" for Dowd's innocence as for his guilt.

More importantly, "if the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States*, 143 S. Ct. 86 (2022). Because the Court finds it was fairly possible for a rational jury to find no reasonable doubt as to Dowd's guilt, the Court declines to overturn the jury's sound verdict of guilty.

Accordingly, Dowd's motion for a judgment of acquittal is denied.

Dated: New York, New York
April 10, 2023

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.